2022 IL App (1st) 191099-U
No. 1-19-1099

FIRST DIVISION
August 15, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 06 CR 9038 |
| NATHANIEL McCRAY, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | James B. Linn, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Walker concur in the judgment.

**ORDER**

¶ 1    *Held:* Second-stage dismissal of defendant's postconviction petition affirmed where defendant failed to make a substantial showing of any constitutional violations. Denial of defendant's motion for judicial substitution and motion for recusal during second stage postconviction proceedings affirmed where there was no evidence of *ex parte* communications or improper contacts between the State and the trial court.

¶ 2    Defendant appeals the second-stage dismissal of his postconviction petition. Previously, in reviewing the trial court's summary dismissal of his postconviction petition, we remanded this case for second stage postconviction proceedings after we found that there was sufficient evidence

to show that the trial court erred in denying defense counsel's request for separate verdict forms. *People v. McCray*, 2013 IL App (1st) 112376-U.

¶ 3                                    BACKGROUND

¶ 4                                       **Trial**

¶ 5        Defendant Nathaniel McCray and his codefendant, Jennifer Reeves (codefendant Reeves), were charged with eight counts of first degree murder, one count of aggravated kidnapping of the victim, Roger Hunz, Jr. (the victim), one count of residential burglary, and one count of possession of a stolen motor vehicle. In a separate jury trial, defendant was convicted of first degree murder and aggravated kidnapping.[1] Defendant was subsequently sentenced to consecutive sentences of 50 years' imprisonment for first degree murder and 25 years' imprisonment for aggravated kidnapping. We affirmed defendant's conviction on direct appeal. *People v. McCray*, No. 1-07-2640 (2010) (unpublished order under Illinois Supreme Court Rule 23)

¶ 6        At trial, the State's theory was that defendant and codefendant Reeves were motivated to commit the kidnapping, torture, and murder of the victim based upon their belief that the victim had money in his apartment. The State's case was largely based on the testimony of Christina Noojin (Christina), her live-in boyfriend, Mitchell Alicea (Mitchell), a surveillance videotape, and the forensic evidence recovered in this case.

¶ 7        On the morning of March 14, 2006, the partially clad body of a male individual was discovered in the alley at 6758 South Campbell Street. This person had sustained injuries to his face, hands, and legs. A dog collar and duct tape were wound around his neck. The police surmised that this

---

[1] Codefendant Reeves was tried before a separate jury and found guilty of first degree murder and aggravated kidnapping. The trial court sentenced her to consecutive sentences of 30 years' imprisonment for first degree murder and 10 years' imprisonment for aggravated kidnapping. We affirmed codefendant Reeves' conviction and sentence on direct appeal. *People v. Reeves*, 2012 IL App (1st) 083199-U.

person had not been killed in the alley based upon the fact that there was only blood on the victim's body and clothing and not at the scene. After fingerprint testing revealed the victim's identity, Chicago police detectives went to the victim's residence and discovered that his car was missing, and his apartment had been ransacked. Based upon information from the victim's brother, the police detectives began searching for Christina and Mitchell.

¶ 8     The victim lived across the street from Christina and Mitchell in Whiting, Indiana before the victim sold his residence and moved to Lansing, Illinois. In March of 2006, Christina and Mitchell had been living together for 13 years, had two children together, and had known the victim for approximately four to five years. Christina also had two older children from another relationship. Christina had also known codefendant Reeves from the neighborhood for approximately ten years. Christina, as well as the victim, had previously purchased drugs from her. Mitchell had previously met codefendant Reeves once or twice prior to March 2006 and had purchased cocaine from her in January 2006. Christina and Mitchell had previously met defendant one time and identified him as codefendant Reeves' boyfriend.

¶ 9     During the evening of March 13, 2006, Christina, Mitchell, codefendant Reeves and the victim were together at Christina's residence when the victim agreed to drive codefendant Reeves to purchase cocaine and asked Christina to accompany them. The victim drove them in his maroon Lincoln Marquis (the Lincoln) while codefendant Reeves directed him to an alley where he parked the Lincoln. A short time later, defendant knocked on the driver's door and was allowed to enter the back seat behind the driver's seat. Defendant gave codefendant Reeves what appeared to be a bag of cocaine, and codefendant Reeves handed the defendant some money. At that point, defendant yelled that he was being set up and began spraying a substance at codefendant Reeves and Christina. He then struck codefendant Reeves. Defendant reached around and started choking

the victim with a cord. The victim struggled to loosen the cord, but defendant pulled it tighter. After the victim stopped struggling, defendant tied the victim's hands and told him that nothing would happen to him if he cooperated. Defendant placed a pillowcase over the victim's head, removed him from the Lincoln, and carried him over to a light-colored SUV ("SUV"), belonging to codefendant Reeves.[2]

¶ 10    Codefendant Reeves sat in the driver's seat of the Lincoln and directed Christina to sit in the front passenger seat. Codefendant Reeves told her that they were going to the victim's apartment in Lansing, Illinois, to get the money that the victim kept there, and she assured Christina that the defendant was not going to harm the victim. Christina was aware that the victim had received approximately $65,000 from the sale of his home in Whiting, Indiana, and had heard him mention this money to other people. Christina, however, knew that the victim kept the money in a bank.

¶ 11    Upon arriving at the victim's apartment, codefendant Reeves opened the doors using the keys on the key ring for the victim's Lincoln. Codefendant Reeves began ransacking the victim's apartment as she looked for the money. She also told Christina to assist in the search, and Christina made it appear that she was doing so. After approximately 20 minutes, codefendant Reeves called defendant on Christina's cell phone and told him that she did not find any money. Codefendant Reeves handed the cell phone to Christina, and defendant told her that the victim said there was $2,000 under the mattress. Christina told defendant that they did not find any money, to which defendant responded that she did not realize how serious this was and said that he had just cut off the victim's ear.

---

[2] Codefendant Reeves' vehicle is referred to as an SUV and as a truck at various points in the record.

¶ 12     At this point, codefendant Reeves drove the victim's Lincoln, with Christina in the front passenger seat, to defendant's residence in Chicago. Codefendant Reeves parked the victim's Lincoln in the alley behind the garage and entered the residence through a side door that went into the basement. Inside the basement, they met defendant and another man, whom codefendant Reeves stated was defendant's brother. Both men were smoking marijuana. Defendant said that he had let the victim go, but Christina did not believe him.

¶ 13     Defendant said, "You guys wanna see some funny shit." He led the three of them to the garage, which was in the rear of the property and along the alley. Defendant opened the side door to the garage and turned on the light. Christina stood in the doorway and saw the victim sitting in a chair in the middle of the garage, towards the large garage door. The victim was tied up with something in his mouth and covered in blood. She did not see the victim moving or breathing. Christina started to cry.

¶ 14     Defendant turned off the light and closed the side door. The four of them walked back into the basement and defendant said he had not done all this for nothing and that he intended to get the money. Codefendant Reeves and Christina got into the victim's Lincoln while defendant and his brother got into Reeves' SUV to drive back to the victim's apartment. On the way there, codefendant Reeves was stopped by the police, so she pulled into a service station. Defendant pulled into the adjacent pump. When codefendant Reeves said that she did not have a driver's license, Christina gave her the name of her daughter, Rebecca. After the officer checked the name, he returned to the Lincoln and cautioned her about her speed. Christina did not alert the police officer about the victim because she was afraid.

¶ 15     Christina's testimony was corroborated by the trial testimony of Vinny Patel, a clerk at the Mobil Gas Station at 159th and Torrence Avenue in Dolton, Illinois. He testified that he saw a

Lincoln pull up to the gas pump, followed by a police squad car and an SUV. The squad car pulled up behind the Lincoln and the SUV pulled into the pump on the other side. A black male exited the SUV, entered the station, and paid for gas for both cars. A few minutes later, the black male came back inside the station and bought a bottle of water. Surveillance equipment at the gas station showed defendant exiting the SUV and entering the station.

¶ 16      Burnham Police Officer Thomas Dillner conducted a traffic stop of a maroon Lincoln after the vehicle accelerated quickly from a stoplight at 159th and Paxton. The occupants of the maroon Lincoln had been arguing with the occupants of a silver Chevrolet Blazer when the two vehicles were stopped for a red light. He activated his mars lights and followed the maroon Lincoln after it pulled into a Mobil Gas Station at 159th and Torrence. He called the stop into his dispatch to let them know his location. He noticed that the silver Chevrolet Blazer pulled into the adjacent gas pump. Officer Dillner approached on the driver's side of the maroon Lincoln and saw two white females inside the vehicle. He advised the driver why he had conducted the stop and asked her for identification. While neither occupant was able to provide him with identification, the driver gave him the name of Rebecca Noojin and a date of birth.

¶ 17      He went to his squad car to run the name and while doing so, he received a call from his partner that he was needed to assist another police officer in a pursuit. He observed a black male exit the SUV parked next to the maroon Lincoln, briefly walk over to the maroon Lincoln, and walk into the gas station. Officer Dillner also saw the black male exit the gas station, pace back and forth for a short amount of time, and then enter the gas station for a second time. During the trial, Officer Dillner narrated what happened as the surveillance video from the gas station was played.

¶ 18      Codefendant Reeves and Christina reunited with defendant and his brother at the victim's apartment building. They entered the victim's apartment and proceeded to further ransack the

residence, to the point of pulling ceiling tiles down and pulling off the ventilation grates, but they did not find any money. Codefendant Reeves began to empty the contents of the freezer into garbage bags and took "TGIF chips" and paper towels. Defendant and his brother removed a television from a television stand and placed it in the back of codefendant Reeves' SUV. With codefendant Reeves and Christina in the victim's Lincoln and defendant and his brother in the SUV, they drove to codefendant Reeves' apartment in Whiting, Indiana, where they left the food. Then, they returned to defendant's home in Chicago and entered the basement. Defendant's brother went to sleep in one of the bedrooms. After codefendant Reeves and defendant went to sleep in the other bedroom, Christina heard them arguing about what to do with the victim's body. Christina heard codefendant Reeves tell defendant to cut off the victim's fingers and pull out his teeth.

¶ 19     Christina took the victim's car keys and drove away from defendant's home in the victim's Lincoln. She got lost and the car ran out of gas. She left the victim's Lincoln parked on the side of the road and called her parents from a nearby convenience store. She threw the car keys in the garbage can at the convenience store. Her father picked her up and drove her back to her home in Whiting, Indiana. She did not tell her father what happened because she was scared. She arrived home in the early morning hours. After being home for a short while, she told Mitchell what happened. Mitchell recalled that this conversation occurred at approximately 8:30 a.m., and he was frightened by what he heard. Thinking that they might be in danger, he called his friend, Peggy Bulutis (Peggy) and asked if they could spend the night at her residence.

¶ 20     Later that night, Christina and Mitchell dropped their two young children off with her mother and went to Peggy's home. While there, codefendant Reeves appeared at the door, kicking, and pounding on the door. Peggy answered the door and codefendant Reeves barged past her and demanded that Christina give her the keys to the victim's car. Christina told her that she did not

have the keys. Codefendant Reeves told her, "You don't know what you're dealing with, you don't know these people, you don't know what's gonna happen." As codefendant Reeves left, Christina looked outside and saw that defendant was inside the SUV with her.

¶ 21    The next morning, Christina and Mitchell decided to go to the Whiting Police Station where they spoke with Detective John Sotello. Christina told him that someone had been taken to Chicago from Whiting, Indiana, and had been hurt or murdered. After Detective Sotello made a telephone call, four detectives from the Chicago Police Department arrived and transported Christina and Mitchell to Area One Police District. While there, she told Chicago Police Detective John Murray what happened. During the interview, she and Detective Murray left the station and went to look for the victim's Lincoln. She was unsure of its exact location, but they ultimately found the car. They also went to the convenience store where she had made the telephone call, and they were able to find the keys to the victim's Lincoln in the garbage. Later, at Area One, both Christina and Mitchell identified defendant in the surveillance videotape as the person walking from the SUV into the gas station. On March 19, 2006, Christina identified defendant in a police lineup.

¶ 22    Christina denied knowing that the victim was going to be killed. She testified that she never agreed to try to find the money or to share in any proceeds from the searches of the victim's residence.

¶ 23    Christina acknowledged that she was a drug user and had been convicted of having obtained prescription drugs through deceptive means. She acknowledged that she had not been charged with any offenses in connection with the victim's death. She further acknowledged that, on another day prior to this murder, she had taken the victim's car without his permission and that he had filed a police report. She was currently incarcerated for not reporting to the judge who gave her probation for a possession of paraphernalia offense.

¶ 24 Mitchell acknowledged that both he and Christina had substance abuse problems in March 2006. He acknowledged that, in 2003, he had been convicted of felony theft in Lake County, Indiana. He had an outstanding warrant for failing to appear on a retail theft charge in Illinois. He testified that he had not received any promises for his testimony with respect to these charges.

¶ 25 At 7:15 a.m., on March 14, 2006, Chicago Police Detective Robert Girardi arrived at the alley behind 6758 South Campbell, Chicago, Illinois, after a body was found at that location. The crime scene has already been secured by 8th District officers. The body was that of a male, partially clothed, but with no identification. He subsequently learned that the body was that of the victim in this case. Chicago Police Officer Steven Strzepek, a forensic investigator, processed the scene while the victim's body was still there. He took photographs of the scene and saw that the victim was only wearing underwear, socks and a sweatshirt. The victim had duct tape between the back of his jaw line and his neck. The victim also had a dog collar around his neck. There were injuries to the victim's face, hands and legs. He found blood on the victim's body and clothing, but no blood in the immediate area. There was no physical evidence in that alley to suggest that the victim had been injured in that alley.

¶ 26 During the investigation conducted by the Chicago Police Department, Detective William Brogan showed Burnham Police Officer Thomas Dillner a photograph of Rebecca Noojin, a white female in her early 20's. Officer Dillner stated that she was not one of the two women inside the car that he stopped. He identified a photograph of Christina Noojin as one of the two occupants of the car that he stopped.

¶ 27 Detective Brogan was one of the officers who, pursuant to a search warrant, conducted a search of codefendant Reeves' apartment in Whiting, Indiana on March 16, 2006. During the search, the

officers recovered photocopies of the victim's driver's license, social security card, and birth certificate.

¶ 28    That same day, Chicago Police Officer Fred Hideman, a forensic investigator, processed the victim's Lincoln after it had been towed and secured at the police auto pound. He used a light scope, an ultraviolet light, as well as super glue fuming process on the interior and exterior of this vehicle to locate fingerprints. From this process, he located two fingerprints, one on the rearview mirror, and another on a hand mirror found on the floorboard. He did not see any blood inside this vehicle. Tiffany Kimble, a forensic scientist, and expert in the field of latent fingerprints, found that only one of the fingerprints was suitable for comparison, and did not match the fingerprints of the defendant or codefendant Reeves. In making her comparisons, she had fingerprints standards from the victim, defendant, and codefendant Reeves, but she did not have them for Christina Noojin or Mitchell Alicea.

¶ 29    The police also secured a search warrant for the victim's apartment at 17701 South Park, Unit 203, Lansing, Illinois. Chicago Police Officer Marvin Otten, a forensic investigator, took photographs of the apartment and searched for evidence. He recovered ten cigarette butts from an ashtray on the living room coffee table. He also recovered ten latent fingerprints from various objects in the apartment. He noticed that there was no television on the television stand in the living room. There were no signs of forced entry into the apartment. Tiffany Kimble tested the ten latent fingerprints taken from the victim's apartment and found the victim's fingerprints on some of these items, but nobody else's fingerprints.

¶ 30    On March 18, 2006, at 2:52 a.m., defendant was arrested by the Chicago police in the basement of his home. That same day, Detective Brogan learned that codefendant Reeves' SUV had been found and was secured at the police auto pound. He went to the auto pound and saw that the interior

of this vehicle had been partially burned. He also saw "red splattering" in the rear seat of the SUV, which he thought might be blood. Chicago Police Officer Raymond Jaster, a forensic investigator, processed this vehicle. He described it as a 2001 Chevrolet Blazer. He took photographs of the vehicle and recovered one fingerprint impression from the hood and another one from the tailgate. He found a red substance on the rear seat and took swabs of it for further testing to determine if it was blood. The forensic testing performed by Kelly Ashton-Hand, an expert in the field of forensic biology, revealed that the swabs from the rear seat did not test positive for blood. The forensic testimony also showed that none of the fingerprints were suitable for comparison.

¶ 31    On March 19, 2006, a search warrant was executed for defendant's home and garage at 6939 South Martin Luther King Drive. When Detective Brogan entered the garage, he saw what he thought were spots of blood in numerous places throughout the garage. He secured the scene and called for the mobile crime lab to process it. A search of the basement area showed a letter addressed to defendant at that address. He did not find a "big screen" television in defendant's home.

¶ 32    Chicago Police Officer William Sullivan, a forensic investigator with the department, was assigned to process the garage and basement areas of defendant's residence. Officer Sullivan noted red stains on the interior surface of the overhead door, a lawn mower, a gas tank on a motorcycle, a wooden door jam, as well as a large, red stain on the concrete floor of the garage. He estimated that the stain on the garage floor was approximately two feet in diameter. Based upon his experience, he believed that the red stains were blood, and that the blood stains appeared to be dried. He thought that it was possible that the red stain on the garage floor showed signs of someone attempting to clean it up. He took samples from four locations. Officer Sullivan also

collected a couple pieces of broken wood that were lying on the floor and portion of a wooden door jamb with molding attached to it.

¶ 33    Kelly Ashton-Hand, an expert in the field of forensic biology, tested the swabs from the four different areas of the garage at defendant's residence. All the swabs tested positive for the presence of blood. She also tested the swab taken from the rear seat of codefendant Reeves' SUV, and it tested negative for the presence of blood. She received ten cigarette butts recovered from the victim's apartment and took snippets from each of these items to preserve it for DNA testing.

¶ 34    Brian School, an expert in the field of DNA analysis, compared the four swabs of blood found inside the defendant's garage, as well as the ten cigarette butts from the victim's apartment. He identified a male DNA profile that matched the DNA profile of the victim for these items and did not match the DNA profile of defendant or codefendant Reeves. He determined that the blood samples from the garage were consistent with having originated from the victim.

¶ 35    The autopsy of the victim's body, conducted by Doctor Lawrence Cogan, showed 223 separate wounds. There were multiple bruises and abrasions. The victim's right ear was nearly cut through from top to bottom. There were injuries around his neck, suggesting that some type of ligature was used to strangle him. There were fractures in the neck area also suggestive of strangulation. These injuries suggested to Doctor Cogan that a choke hold was used. The victim's jaw was also fractured, and there were linear marks and abrasions on the neck and a laceration on the chin. These injuries did not usually occur through strangulation, indicating that there was separate blunt trauma to the chin area. Doctor Cogan testified further that there were patterns to the contusions found the victim's body. Some indicated a man-made object had been used on him and would be consistent with the door hinge attached to a piece of wood. Another pattern formed a loop, which was consistent with a dog leash. There was also a strong smell of gasoline when Doctor Cogan

first opened the bag containing the victim's body. The condition of his skin indicated the use of a solvent on the body, most likely after death. The victim also had internal injuries, including hemorrhaging in the brain, fractured ribs and neck bones, and a fractured hand. His organs were pale because of blood loss. The toxicology report indicated the victim had recently used cocaine. Dr. Cogan determined that the cause of death was the multiple injuries related to the assault along with strangulation, and the manner of death was homicide.

¶ 36    Defendant testified in his own behalf, and the defense called the victim's younger brother, William Hunz, and defendant's grandmother, Mae McCray, as witnesses. William Hunz testified that the victim lived across the street from Christina Noojin and Mitchell Alicea, and the victim sold his home in Whiting, Indiana in late 2005. He was aware that his brother had a drug problem but denied that his brother moved away from Whiting because of his drug problem. He was also aware that his brother's car had previously been taken, and afterwards he discovered that Christine Noojin had taken it.

¶ 37    Mae McCray testified that she lived at 6959 South Martin Luther King Drive, Chicago. Her residence had a detached garage, located in the back of the property and along an alley. In 2006, between February and March, defendant lived in the basement of her residence.

¶ 38    On February 25, 2006, she was awakened by the sounds of someone beating on the back door. Defendant answered the door. Looking out to the front of the house, she saw defendant arguing with a white female, known to her as Jennifer. She saw Jennifer strike defendant, and she was yelling about the keys to her "truck." Then, she saw Jennifer hand keys to defendant. She also saw Jennifer's "truck" and a dark car parked behind the it. Jennifer pulled away in her vehicle with the other car following her.

¶ 39    Ms. McCray never saw defendant bring a white male to her residence or to the garage. She never saw defendant clean the garage. She never saw the police remove a large television set or frozen food from her residence when they arrested defendant.

¶ 40    Defendant testified to his previous criminal history, including a juvenile adjudication for possession of a controlled substance and an adult arrest for possession of a controlled substance and, while released on bond, for aggravated battery to a government employee.

¶ 41    Defendant acknowledged that he knew codefendant Reeves and that they had previously taken drugs together. She went to his residence because he knew people who sold drugs. Codefendant Reeves and someone named "Chrissy" had been in his basement.

¶ 42    Around midnight on March 14, 2006, he was returning home from the store when he heard a horn sound and saw codefendant Reeves in a maroon Lincoln. She asked him to follow her so she could return this vehicle to a friend. Codefendant Reeves told him that "Chrissy" had driven her truck, parked it behind defendant's house, and codefendant Reeves handed car keys to her truck. Defendant asked her where they were going, and codefendant Reeves said they were going to Chicago Heights or something like that. Defendant was suspicious but did not want anything to happen to codefendant Reeves.

¶ 43    Defendant further testified that, after following codefendant Reeves for a long time, he pulled up next to her at a stoplight and asked her where they were going. Defendant yelled at codefendant Reeves when she told him that the Lincoln needed gas, but she had no money. Codefendant Reeves sped up and was pulled over by the police. Both cars pulled into a gas station, and defendant spoke to her before going inside the station to pay for gas.

¶ 44    At that point, defendant drove back to Chicago in codefendant Reeves' truck. He parked this vehicle at 73rd Street and Eberhardt Avenue and walked home. He never returned the truck to

codefendant Reeves, never spoke to her again, and kept the keys to the truck. He thought that she must have picked up her truck at some point.

¶ 45    Defendant denied killing, beating, or torturing anyone for money in his garage. He denied meeting the victim and knowing anything about money from a house sale. He denied that he searched for money in a condominium with codefendant Reeves.

¶ 46    On cross-examination, defendant testified that he met codefendant Reeves around Christmas in 2005. He purchased drugs for her on two or three occasions. He recalled that, in the middle of February 2006, he had an argument with her about her truck, during which he told her that he did not want to see her again.

¶ 47    Defendant testified that he was surprised by codefendant Reeves' request for assistance in returning the Lincoln. He went along with her request because he did not want anything to happen to her. When the police stopped her, defendant left because he knew she did not have a driver's license, and she was probably going to jail. Later that morning, he checked and saw that her truck was no longer where he had parked it. In the following five or six days, he did not contact her or go into his garage.

¶ 48    As the jury began its deliberations, the trial court stated, "All right. Let me know if there is any objection about any exhibits going back. No police reports, protocol is not going back, also doctor's chart is not going back. The pictures and physical exhibits are available. Let me know if you have any objections…" There was no further discussion regarding the exhibits.

¶ 49    During jury deliberations, the trial court, after noting that both parties were present, stated that the jury had requested the transcript of Christina's testimony, and that "[i]t was tendered by agreement of the parties…"

¶ 50    After the verdict was announced, the following colloquy occurred:

COURT: Back on the record. There were a few things that did come up. One thing was the Government asked that the piece of wood that had been received in evidence but not given to the jury during deliberations last night be given to the jury. This was done over the objection of the defense.

The Court believed that they were entitled to see so the defense made a timely objection.

As a matter of fact, the Government asked for it last night.

Anything else you want to say about that timely objection being made?

[DEFENSE COUNSEL McBETH]: Although we did make ourselves available, we were not building. [sic] The only person who was aware that was happening was able to be in court was Mr. Florey, and he was not, an objection was made on the record with the court reporter.

We do think that it makes no difference. They asked for all the evidence as opposed to it coming in without request. For the jury this morning and suggesting because obviously was from Your Honor, perhaps there's something important they could be looking at since they couldn't reach a decision last night.

We had made that objection. If Marijane had been afforded the chance to come over here and we had an objection.

COURT: Mr. Florey did have that I'm not sure where you were. I'm not holding it upon the fact it was received in evidence and it was relevant. Either side had asked to go back, it would have gone back.

Understanding what you said now, Mr. Florey did make timely objection at the time.

¶ 51     The trial court further noted that the jury had sent out a note requesting a transcript, that the transcript for unavailable at that time, but subsequently "we did give them that transcript and both sides agreed to that." In response, defense counsel stated, "I think what both sides agreed to your Honor's response on paper which was transcript was not available and then it became available later." During further discussion, defense counsel again stated the defense had objected to the transcript going back to the jury.

¶ 52                                    **Direct Appeal**

¶ 53     On direct appeal, defendant challenged his conviction on the following grounds: (1) the trial court improperly admitted codefendant Reeves' statements under the co-conspirator exception to the hearsay rule thereby violating his Sixth Amendment confrontation rights; and (2) he was not proven guilty of first degree murder and aggravated kidnapping beyond a reasonable doubt. We affirmed defendant's convictions. *People v. McCray* No. 1-07-2640 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 54                        **Postconviction Petition and Remand**

¶ 55     On May 12, 2011, defendant filed a *pro se* petition for postconviction relief pursuant to the Illinois Postconviction Hearing Act. 725 ILCS 5/122-1 *et seq.* (West 2008). In the petition, defendant asserted: (1) the trial court abused its discretion by denying his request for separate verdict forms; (2) the trial court denied him a fair trial by allowing the State to admit uncorroborated evidence without a sufficient chain of custody; (3) the State committed a *Batson* violation during jury selection; (4) the State committed a *Brady* violation by failing to disclose a deal with Christina Noojin, thereby supporting perjury; (5) the trial court erred by allowing a wooden door frame wrapped in a bag marked "hazardous material" back to the jury during deliberations; (6) he was denied effective trial counsel when counsel failed to object to chain of

custody, failed to object at trial and file a post-trial motion regarding separate verdict forms, and failed to investigate DNA evidence to establish that Christina Noojin lied; (7) he was denied effective appellate counsel for failing to raise the aforementioned claims, failed to provide legal support for the admission of surveillance video and the door frame, and failed to confront witnesses; (8) the "cumulative and synergistic effect" of appellate counsel's errors denied the defendant his right to due process; and (9) there was newly discovered evidence of his actual innocence.

¶ 56     The circuit court summarily dismissed the petition. Defendant appealed the summary dismissal. In reviewing the summary dismissal, we reversed the summary dismissal of the postconviction petition on the ground that there was sufficient evidence to show that the trial court erred in denying defense counsel's request for separate verdict forms. Specifically, we found:

> The trial court erred when it denied defendant McCray's request for separate verdict forms, and the error provided a meritorious issue for appeal. Even if forfeited, since the error fell under the second prong of the plain error, it would have been reviewed on appeal. Had appellate counsel raised plain error on direct appeal, there was a reasonable probability that the appellate court would have vacated defendant McCray's conviction for aggravated kidnapping and his 25-year sentence for that offense.
>
> We conclude that defendant McCray's postconviction petition had an arguable basis in both fact and law and was not subject to summary dismissal. The petition must be advanced to the second stage of postconviction proceedings. We do not address defendant McCray's ineffective assistance of appellate counsel claim with respect to the door jamb exhibit. See *People v. Sparks*, 393 Ill.App.3d 878, 887 (2009) (partial summary dismissals are not

permitted at the first stage of postconviction proceedings). *People v. McCray*, 2013 IL App (1st) 112376-U, ¶¶ 27-28."

¶ 57     Upon remand, defendant was appointed counsel to represent him in his postconviction proceedings. On February 14, 2011, defendant filed a *pro se* motion for substitution of judge asking that Judge Linn be removed from the pending postconviction case. He asserted that Judge Linn: "has already shown his inability to correct his own mistakes"; "has already pre-judged" the claims as shown by his summary dismissal; commenting at trial involving the relevancy of "that piece of wood"; used his personal knowledge of defense counsels in dismissing the ineffective assistance of counsel claim; was the subject to the defendant's complaint to the Judicial Inquiry Board; and could be called as a "material witness" in "future hearings.

¶ 58     The motion was transferred to the Honorable Dennis Porter. The record does not contain the transcript from the hearing, before Judge Porter, on the defendant's motion for substitution. However, we can surmise that Judge Porter denied this motion when defendant subsequently filed a motion to reconsider. In that motion, he alleged that Judge Linn had an "ex parte communication" with the prosecution during the jury trial regarding physical evidence that was sent back to the jury. According to defendant's motion, "one of the attorneys was made aware of what occurred in his and his counterparts absence and entered an objection with the court reporter"; this attorney "was not authorized as a third chair to handle any evidence going back to the jury"; Judge Linn was "intricately involved in this case and will be called upon to rule on its merits at the second stage," and could "well be a witness" if a third-stage hearing was granted; the issue of the door jamb going back to the jury "without the input or objection and arguments of lead counsel is a substantive issue," and that Judge Linn's statements in summarily dismissing the petition at the

first stage showed the court "failed to liberally construe the record in [the defendant's] favor, and instead made impermissible factual determinations about the evidence."

¶ 59    At the hearing on the defendant's *pro se* motion to reconsider, he was represented by his postconviction counsel. When Judge Porter commented that "This looks to me, like, it is nothing more than a rehash of his original claim, again," postconviction counsel stated that the defendant attached the affidavit of "the lead attorney" at trial regarding Judge Linn's failure to notify the first chair and second chair defense counsel about an exhibit going back to the jury during deliberations. Postconviction counsel stated that "we think that's a problem in Judge Linn having to rule on this issue that directly concerns him and the conduct." Judge Porter denied the motion to reconsider stating, "I think my original ruling is correct," and transferred the case back to Judge Linn.

¶ 60     Then, on August 27, 2015, postconviction counsel filed a motion for recusal on the basis that Judge Linn was "intricately involved" in the ineffective assistance of appellate counsel claim for failure to raise the issue of the propriety of the wooden door jamb going back to the jury during deliberations, would be "called upon to rule on its merit at the second stage," and if the postconviction petition proceeded to the third-stage, he would be a potential witness. In support, postconviction counsel cited to Illinois Supreme Court Rule 62, that a judge should avoid the appearance of impropriety, and Illinois Supreme Court Rule 63, precluding a judge from participating in *ex parte* communications. An affidavit from one of defendant's trial counsels, Assistant Public Defender Marijane Placek (APD Placek), was attached to the motion. APD Placek averred that, "[w]hen an issue came up about sending a wooden door jamb wrapped in a plastic bag marked 'Hazardous Material' to the jury, only our third chair, APD Daniel Florey was present in the courtroom." She further averred that, her "strong recollection" was that she and the other defense counsel were not present in the courthouse at this time, APD Florey was "not authorized

to handle" these types of questions, and she "was not able to make the forceful objection I would have wanted to make…"

¶ 61    In hearing this motion, Judge Linn expressed concern that this issue had already been addressed and resolved by Judge Porter when defendant filed his *pro se* motion for substitution. Postconviction counsel stated that the previous motion was filed *pro se*, defendant incorrectly thought that he had the automatic right to have Judge Linn removed from the case, and this motion listed "some, you know, different case law and different reasons" for recusal. When postconviction counsel noted that APD Placek stated in her affidavit that "the correct objection" should have made, Judge Linn stated, "There were no objections that might have been made that would have caused me to not send that item back to the jury" and "It was going back. It would not make any difference to me whether [the first chair] or [second chair] had objected vociferously that they thought it would be more prejudicial than probative. I found that the item would have been extremely probative." In response to Judge Linn's question as to whether he could rule on this motion himself or had to send it another judge for ruling, postconviction counsel said that Judge Linn could rule on it. Judge Linn denied the motion, finding that "…I don't believe that no matter what [the second chair] or [the first chair] might have said by way of objection that it would have prevented that item from going back to the jury."

¶ 62    As the case proceeded, on April 10, 2017, defendant filed a motion to proceed *pro se*, citing "irreconcilable differences pertaining to several issues[,]" which the trial court granted. Subsequently, defendant sought leave to file a "petition of mandamus" in which he, again, alleged that Judge Linn violated Illinois Supreme Court Rule 63 by engaging in an *ex parte* communication. During a subsequent hearing date, defendant also informed Judge Linn that he was verbally requesting a motion for substitution on the grounds that he was not present when

Judge Porter ruled on his original motion for substitution, and he wanted the opportunity to address Judge Porter about his claim.

¶ 63    On February 13, 2018, defendant was present for the hearing on his motion for substitution before Judge Porter. The matter was continued until April 26, 2018, at which time, defendant argued that Judge Linn admitted that there was an *ex parte* communication. Judge Porter stated, "I don't read it that way…" and "You are reading things into it that I don't think are there…" Judge Porter denied defendant's motion for substitution.

¶ 64    In the postconviction proceedings after the case was remanded, defendant filed two additional supplemental postconviction petitions. In the supplemental petitions, in support of his claim of actual innocence, he attached the affidavits of Kiearre Reese (Reese). The first affidavit is dated July 18, 2013, and the second affidavit is dated May 7, 2015. In both affidavits, Reese averred that on the morning of March 14, 2006, she was on the back porch of the second floor of 6933 South King Drive when she heard some car doors slam. She saw, in a vacant lot across the alley from her location, codefendant Reeves, Christina Noojin and Shannon Randolph.[3] They were standing between codefendant Reeves' truck and a red car. Shannon Randolph entered the front seat of the truck while codefendant Reeves and Christina walked towards defendant's garage. Christina returned helping a "drunk white guy wearing only a yellow hoodie and a pair of dirty white brief style underwear." Codefendant Reeves and Christina put the man in the back seat of the truck, and Christina retrieved a butcher knife from the passenger side of the red car. She further averred that Christina got back into the truck, got on top of the man "like they were having sex" and stabbed the "white guy" for "a few minutes." Codefendant Reeves traded places with Christina, "got on

---

[3] During argument on his claim of actual innocence, defendant stated that Shannon Randolph is a male also known as Odell White. Odell White was listed as a potential witness on the State's answer to discovery. There is no other mention of this person in the record.

top of the white guy and started to stab him" for "a few minutes" while Christina and Shannon watched. Then, codefendant Reeves retrieved a "reddish color rope" from the rear storage area of her truck, handed it to Christina, who chocked the man for "couple of minutes." Codefendant Reeves took the rope back and also chocked him. The two of them also repeatedly hit the man with a piece of concrete they found on the vacant lot. They threw the piece of concrete back onto the ground.

¶ 65    Codefendant Reeves grabbed an empty plastic bag off the ground, put the knife and bloody rag inside of it, and walked towards defendant's garage. Codefendant Reeves quickly returned from the garage and threw the plastic bag into the garbage can behind 6935 South King Drive. Codefendant Reeves drove away in her truck followed by Christina drove away in the red car. Reese attested that she never came forward out of fear of Randolph, who was in a gang. She also attested that defendant was "completely innocent of this crime." In the second affidavit, Reese further averred that she was never contacted by any of defendant's family members or defense team. She never told anyone what she saw because she was scared, but she was no longer scared because "I know the police can protect me where I'm at now."

¶ 66    The trial court granted the State's motion to dismiss after concluding that none of defendant's claims had merit. The trial court, however, vacated defendant's consecutive sentence of 25 years' imprisonment for aggravated kidnapping based upon the error in failing to provide separate verdict forms. Consequently, trial court corrected the mittimus to reflect that defendant's sentence for aggravated kidnapping run concurrent to his sentence for first degree murder.

¶ 67                                ANALYSIS

¶ 68    On appeal, defendant attacks the trial court's decisions regarding his motion for recusal and his motions for substitution, filed during the pendency of the second-stage proceedings of his

postconviction petition. Defendant also attacks on several different grounds, the trial court's decision to grant the State's motion to dismiss his postconviction petition at the second stage.

¶ 69                    **I. Motion for Recusal and Motion for Substitution**

¶ 70        During the second stage of postconviction proceedings, defendant, while being represented by postconviction counsel at that time, filed a *pro se* motion for substitution. Defendant argued that Judge Linn and the State had engaged in an *ex parte* conversation during jury deliberations as to whether the jury should receive an admitted exhibit, a wooden door jamb, and the trial transcript of Christina Noojin's testimony. Subsequently, postconviction counsel subsequently filed a motion for recusal arguing that Judge Linn should have recused himself where the discussion regarding an exhibit was sent back to the jury without his two lead defense counsels being present. On appeal, defendant challenges the denial of both motions.

¶ 71        We recognize, as our supreme court has noted, "recusal and substitution for cause are not the same thing." *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 45. Thus, our supreme court has provided helpful guidance regarding the law pertaining to the differences between requests for a court to recuse itself under the Code of Judicial Conduct versus a motion compelling the substitution of judge for cause under either the civil or criminal statutes. *Id.* Whether a judge should recuse or himself or herself is a decision that rests exclusively within the determination of the individual judge, whereas petitions for substitution for cause under the statute can be brought by a party and are decided by another judge. *Id.* at ¶¶ 45-46.

¶ 72        We first consider the denial of defendant's motion for substitution. Pursuant to section 114-5 of the Criminal Procedure Code (725 ILCS 5/114-5 (West 2014)), a defendant may file a motion for substitution of judge. This section allows for a second judge to hear the petition, allaying due process concerns, and "ensures that any substitution coming after a substantive ruling has been

made is the result of a proven bias or high probability of the high risk for actual bias and is not a mere ploy for tactical advantage." *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 46. In other words, the forced removal of a judge in such circumstances requires that actual prejudice, "that is, either prejudicial trial conduct or personal bias," be established. *Id.* at ¶ 30. The *O'Brien* court held, "[I]n construing the term 'cause' for purposes of a substitution once a substantial ruling has been made in a case, Illinois courts have consistently required actual prejudice to be established, not just under the current statute, but under every former version of the statute." *Id.* at ¶ 30. It is not enough for a defendant to allege there is a potential appearance of impropriety, as it does not equate to actual prejudice. *People v. Klein*, 2015 IL App (3d) 130052, ¶ 89. Prejudice has been defined as "animosity, hostility, ill will, or distrust towards [the] defendant." *Id.* (quoting *People v. Patterson*, 192 Ill.2d 93, 131 (2000)). Bias sufficient to remove a judge for cause must be "a deep-seated favoritism or antagonism that would make fair judgment impossible." (internal quotation marks omitted.) *O'Brien*, 2011 IL 109039, ¶ 46 (quoting *Eychaner v. Gross*, 202 Ill.2d 228, 280 (2002)).

¶ 73    We also recognize that defendant's request was made during the pendency of his postconviction petition. As we previously recognized, "There is no absolute right to a substitution of judge in postconviction proceedings. Rather, there is a preference for the judge who presided over a defendant's trial to also preside over the postconviction proceedings." *People v. Zirko*, 2021 IL App (1st) 162956, ¶ 28 (citing *People v. Hall*, 157 Ill.2d 324, 331 (1993)). During postconviction proceedings, the defendant must show that allowing the same judge to preside over the case would result in "substantial prejudice." *Id.* (citing *People v. Townsend*, 2020 IL App (1st) 171024, ¶ 49).

¶ 74        "'The trial court's decision on a petition for substitution for cause will not be disturbed unless it is against the manifest weight of the evidence.'" *In re Marriage of Potenza and Wereko*, 2020 IL App (1st) 192454, ¶ 45 (citing *In re Marriage of Peradotti*, 2018 IL App (2d) 180247, ¶ 16). Findings are against the manifest weight of the evidence if they are clearly erroneous, or the record supports an opposite conclusion. *People v. Haywood*, 2016 IL App (1st) 133201, ¶ 29 (citing *People v. Mercado*, 244 Ill.App.3d 1040, 1047 (1st Dist. 1993)).

¶ 75        In the present case, we cannot say that Judge Porter's denial of defendant's motion to substitute for cause was against the manifest weight of the evidence. Our review of the record does not lead us to the opposite conclusion from the trial court. The crux of defendant's claim is that Judge Linn engaged in an *ex parte* communication with the State as to whether an exhibit should be sent back to the jury during deliberations. The record, however, contains no evidence of *ex parte* communications or improper contacts by the trial judge. In fact, Judge Linn explained that one of defendant's three attorneys was present for this discussion and stated his objection. In defendant's motion for a new trial, he argued trial court error "in sending the six-foot-long board back to the jury during deliberations, over the defense objection." On appeal, defendant concedes that one of the three attorneys who represented him at trial was present for the discussion with the State and Judge Linn regarding the propriety of sending the wooden board, admitted into evidence, for the jury to view during their jury deliberations. See *People v. Kliner*, 185 Ill.2d 81, 169-170 (1998) (the trial court did not err in not recusing itself where the record did not contain evidence of any *ex parte* communications concerning the merits of the case).

¶ 76        We reach the same conclusion as to defendant's claim that the trial court and the State engaged in an *ex parte* communication as to whether the jury should receive a copy of Christina Noojin's trial transcript.  The record clearly refutes this claim where defense counsel admitted, during a

subsequent discussion, that one of the three defense counsels was present and had objected at the time that this issue was raised. Because the evidence refutes defendant's claim that there was an *ex parte* communication, defendant did not demonstrate actual prejudice.

¶ 77    We also find that defendant's reliance upon *People v. Wilson*, 37 Ill.2d 617 (1967) and *People v. Washington*, 38 Ill.2d 446 (1967) are unpersuasive. *Wilson* involved an allegation regarding the effect of certain pretrial *in camera* conversations between the defendant's attorney and the trial judge on the sentence the defendant ultimately received. In that case, the court found that the trial judge would necessarily be a material witness and have knowledge *de hors* the record of the truth or falsity of the allegations.

¶ 78    Likewise, in *Washington*, the defendant alleged that he pled guilty in reliance upon his defense counsel's representation that defense counsel had discussed his case with the trial judge and the prosecutor, off the record, and they had agreed that, if the defendant pled guilty, he would be sentenced to 14 years' imprisonment. *Washington*, 38 Ill.2d at 451. Citing to *Wilson*, the court held, "And since in this case 'either the trial judge would be a material witness ***or would have knowledge De hors [sic] the record of the truth or falsity' of the allegations of the petition, the proceeding should be transferred to another judge for hearing." *Id.* at 451.

¶ 79    Here, the issue is not the truth or falsity of the allegations, but whether an *ex parte* communication occurred. From the record, no such *ex parte* communication occurred as one of defendant's three attorneys who represented him at trial was present for the discussion.

¶ 80    We now consider defendant's motion for recusal. A defendant may file a motion for recusal pursuant to Illinois Supreme Court Rule 63(C)(1) (eff. July 1, 2013). "'Unlike a motion for substitution of judge, a motion for recusal does not trigger a duty on the part of the trial judge to transfer the motion to another judge for determination.'" *People v. Hinthorn*, 2019 IL App (4th)

160818, ¶ 61; (quoting *Kamelgard v. American College of Surgeons*, 385 Ill.App.3d 675, 681 (2008)).

¶ 81    Illinois Supreme Court Rule 63(C)(1) directs a judge to voluntarily recuse himself where his impartiality may reasonably be questioned, including when he "has a personal bias or prejudice concerning a party ***or personal knowledge of disputed evidentiary facts concerning the proceeding" has "served as a lawyer in the matter in controversy," is known "to have more than a *de minimus* interest that could be substantially affected by the proceeding, "or is likely to be a material witness in the proceeding." Ill.S.Ct.R. 63(C)(1)(a), (b), (e)(iii), (e)(iv) (eff. July 1, 2013). Additionally, judges may voluntarily recuse themselves where their "impartiality might reasonably be questioned" [citation] including 'situations involving the appearance of impropriety.'" *Obrien*, 2011 IL 109039, ¶ 39. In the context of a motion for recusal, we must determine whether the decision was an abuse of the judge's discretion. *Barth v. State Farm Fire & Casualty Co.*, 228 Ill.2d 163, 175 (2008); *People v. Kliner*, 185 Ill.2d 81, 169 (1998).

¶ 82    Although Rule 63(C) provides an extensive list of circumstances requiring judicial self-disqualification, none of those reasons exist here. Again, the basis for defendant's claim on judicial error is that an *ex parte* communication occurred between Judge Linn and the State, creating a situation in which defendant was prevented from having a fair trial. The record does not support defendant's claim, and, in fact, directly refutes that such a situation occurred. Thus, the trial court exercised appropriate discretion in denying defendant's motion for recusal.

¶ 83                                    **II. Postconviction Proceedings**

¶ 84    The remaining claims relate to the second-stage dismissal of defendant's postconviction petition. Defendant's assertions concern several claims of ineffective assistance of trial and appellate counsels as well as a claim of actual innocence. The Post-Conviction Hearing Act (Act)

(725 ILCS 5/122-1 *et seq.* (West 2008)) provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Hodges*, 234 Ill.2d 1, 9 (2009); *People v. Peeples*, 205 Ill.2d 480, 509 (2002). Here, the trial court reviewed defendant's postconviction petition at the second stage of postconviction proceedings. At this stage, counsel may be appointed to an indigent defendant (725 ILCS 5/122-4 (West 2008)), and the State, as respondent, enters the litigation (725 ILCS 5/122-5 (West 2008)). The circuit court must determine whether the petition and any accompanying documentation make "a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill.2d 239, 246 (2001) (citing *People v. Coleman*, 183 Ill.2d 366, 381 (1998)). At this stage, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true. *People v. Pendleton*, 223 Ill. 458, 473 (2006). The court reviews the petition's factual sufficiency as well as its legal sufficiency considering the trial court record and appliable law. *People v. Ryburn*, 2019 IL App (4th) 170779, ¶ 22 (citing *People v. Alberts*, 383 Ill.App.3d 374, 377 (4th Dist. 2008)).  If no such showing of a constitutional violation is made, the petition is dismissed. *Edwards*, 197 Ill.2d at 246. If, however, a substantial showing of a constitutional violation is set forth, the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. *Id*; 725 ILCS 5/122-6 (West 2008). We review *de novo* the circuit court's dismissal of a postconviction petition at the second stage. *Pendleton*, 223 Ill.2d at 473.

¶ 85                                    **A. Ineffective Assistance of Counsel**

¶ 86        Defendant asserts that his trial counsel was ineffective for failing to preserve several issues for appellate review, and his appellate counsel was ineffective for failing to properly raise several claims on direct appeal. Claims of ineffective assistance of counsel are resolved under the standard

set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The *Strickland* test also applies to claims of ineffective assistance of appellate counsel. *People v. Rogers*, 197 Ill.2d 216, 223 (2001). Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced the defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill.2d 142, 163 (2001). To show sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case can be disposed of on the ground of lack of sufficient prejudice, the court need not consider the quality of the attorney's performance. *Id*. at 697.

¶ 87       A defendant who claims that appellate counsel was ineffective for failing to raise an issue on appeal must allege facts demonstrating that such failure was objectively unreasonable and prejudiced the defendant. *Rogers*, 197 Ill.2d at 223. Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence for counsel to refrain from raising issues that, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. *People v. Simms*, 192 Ill.2d 348, 362 (2000). Thus, the inquiry as to prejudice requires the court to examine the merits of the underlying issue, for a defendant does not suffer prejudice from appellate counsel's failure to raise a nonmeritorious claim on appeal. *Id*. Appellate counsel's choices concerning which issues to pursue are entitled to substantial deference. *Rogers*, 197 Ill.2d at 223.

¶ 88                    **1.  Failure to Cite Legal Authority on Direct Appeal**

¶ 89     Defendant first asserts that appellate counsel was ineffective for failing to cite any legal authority for the claim, raised on direct appeal, that the wooden door jamb should not have gone back to the jury during its deliberations. In particular, defendant asserts that he was prejudiced when the wooden door jamb, found in defendant's garage, was packaged to suggest that it contained blood, but where the prosecution failed to prove that the red stains were blood. For clarification, defendant raised this same issue in his motion for a new trial, stating that "[t]he board was enclosed in a plastic bag with warnings that it contained toxic or biological evidence." He points to this court's decision, on direct appeal, that the failure to cite to any legal authority resulted in forfeiture of this claim. *People v. McCray*, No. 1-07-2640 (2010) (unpublished order under Illinois Supreme Court Rule 23)

¶ 90     Defendant, however, has not provided this court with any relevant legal authority or citation to the trial court record to persuade this court that his claim had merit. See *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 28 ("Given that appellate counsel at bar has the same record that was available to counsel on direct appeal, if meritorious issues were forfeited, it would seem an easy matter to provide us with that which appellate counsel in his first appeal failed to provide.")

¶ 91     In support, defendant relies on *United States v. Adams*, 385 F.2d 548 (2d Cir. 1967) and *United States v. Ware*, 247 F.2d 698 (2d Cir. 1957). However, both cases are distinguishable. Those cases involved prosecutions for the unlawful sale and possession of narcotics. The jury was allowed to consider, in their deliberations, the government agent's notations on envelopes used to deliver the illegal substance to an examining chemist. Both courts found that submission of these statements was prejudicial because the notations provided a complete summary of the government's entire case against the defendant, and the trial judge allowed the jury to consider the exhibits in their deliberations. *Adams*, 385 F.2d at 550; *Ware*, 247 F.2d at 700. Here, the exhibit was admitted into

evidence and did not contain any attachments or notations that could be persuasive. Therefore, he does not provide any legal authority in support of his claim.

¶ 92    The trial record also does not support defendant's claim. Defendant suggests that his appellate counsel was ineffective for forfeiting this claim where, sending the wooden door jamb back to the jury, misled the jury because it "suggested that it bore [the victim's] blood" which was a fact not established by the evidence. We recognize that it is within the discretion of the trial court whether to allow evidence to be taken into the jury room. *People v. Shum*, 117 Ill.2d 317 (1987). Here, we cannot find that the trial court abused its discretion. The jury was aware that, while the victim's blood was identified from four different samples taken from different areas of defendant's garage, Officer Sullivan did not take a sample from the wooden door jamb that also contained a red stain. The medical examiner, Doctor Cogan, testified that the injuries to the victim's groin area was consistent with the use of a man-made object such as "some type of board or some type of squared-off wooden two-by-four or something of that sort[.]" Doctor Cogan also testified that the injuries to the victim's right inner thigh were consistent with being caused by an object such as the wooden door jamb. The State also never argued that the victim's blood was found on the wooden door jamb. Moreover, contrary to defendant's claim otherwise, the State did not argue that the evidence established that this exhibit was used to kill the victim, but only that Dr. Cogan testified that it was consistent with some of the victim's injuries. As Judge Linn noted, the wooden door jamb was sitting in the courtroom for the jury to see and was used in closing arguments. Consequently, there is no basis for defendant's underlying claim that the trial court abused its discretion in allowing this exhibit to be sent back to the jury during its deliberations. Thus, we find that he cannot establish his claim of ineffective assistance of appellate counsel.

¶ 93                                 **2.  Separate Verdict Forms**

¶ 94    Next, defendant contends that appellate counsel was ineffective for failing to raise a claim that he was deprived of his "right to a jury verdict" involving separate verdict forms. However, this issue has already been resolved by the trial court. Upon remand, Judge Linn reviewed this claim and vacated defendant's aggravated kidnapping conviction and 25-year consecutive sentence. We need not address defendant's claim further.

¶ 95                              **3. Motion to Suppress Arrest**

¶ 96    Defendant contends that he received ineffective assistance of trial and appellate counsels for failing to file a motion to suppress, and to challenge on direct appeal, the constitutionality of his arrest when he was arrested pursuant to an investigative alert rather than a warrant from a neutral magistrate. We find that defendant did not make a substantial showing of ineffective assistance of trial counsel where, even if he was illegally arrested pursuant to an investigative alert, because the other evidence of guilty was overwhelming, the admission of evidence derived from defendant's arrest constituted harmless error. Moreover, because there is no merit to defendant's underlying claim, he cannot establish his claims that he received ineffective assistance at the appellate level.

¶ 97    On March 14, 2006, at approximately 7:00 a.m., the police were notified after the victim's body was found in the alley behind 6758 South Campbell, Chicago, Illinois. During the police investigation, Detective Brogan viewed the surveillance video from the gas station with Christina and Mitchell, and they identified defendant as the person walking into the station. Detective Brogan testified that, after viewing the video, "we asked the State's Attorney for an arrest warrant." Defendant's objection to this testimony was sustained, and the trial court instructed the jury to disregard this testimony. On March 18, 2006, at 2:52 a.m., defendant was placed under arrest after he was found in the basement of his home by Officer Czubak, who testified that he was part of a team who would "go on warrant missions, investigative alert mission." Defendant's arrest report

shows that the arresting officers "had knowledge above subject was wanted on an investigative alert #2999936581 probable cause to arrest." After defendant's arrest, he was placed in a physical lineup in which he was identified by Christina.

¶ 98      In resolving this issue, we turn to our recent decision in *People v. Smith*, 2022 IL App (1st) 190691, ¶ 99, and likewise find that defendant's warrantless arrest, based solely on an investigative alert, violated article I, section 6, of the Illinois Constitution. The state constitution contemplates that an arrest warrant shall issue after an "affidavit" is submitted to a neutral magistrate for a determination of probable cause. Ill. Const. 1970, art. I, § 6 ("No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized.") An investigative alert circumvents the role of a magistrate, as it allows for an arrest based on a probable cause determination made by the Chicago police, rather than a neutral judge. See *People v. McGurn*, 341 Ill. 632 (1930) (an arrest cannot be solely based on a "standing order" from a superior officer, as "under the constitution of this state no municipality has authority to clothe any officer with the autocratic power to order the summary arrest and incarceration of any citizen without warrant or process of law").

¶ 99      However, as in *Smith*, we also find that because the other evidence of guilt was overwhelming, the admission of evidence derived from defendant's arrest was harmless error. *Smith*, 2022 IL App (1st) 190691, ¶ 100. "That is, we cannot say the improperly admitted evidence affected the verdict, given the other evidence of guilt." *Id.* Defendant asserts that he is entitled to a new trial without the evidence resulting from his illegal arrest, namely Christina's identification of him in a physical lineup, and the evidence recovered during the search warrant executed for his garage. While we agree that the improperly admitted evidence derived from defendant's arrest included Christina's identification of him during a physical lineup, the record clearly contradicts that the evidence

secured by the search warrant for his garage derived from his arrest. The record includes the complaint for search warrant for his garage, and it does not reference defendant's arrest or Christina's identification of him during the lineup as a basis for the request for a search warrant.

¶ 100     However, even without the evidence derived from his arrest, there was overwhelming evidence of guilt. The trial evidence included the detailed eyewitness testimony of Christina, who was well acquainted with defendant and codefendant Reeves, which was corroborated by Mitchell's testimony, the state of the victim's apartment following the search for money, and the physical evidence found inside defendant's garage, including the victim's blood found splattered in various places and a large pool of the victim's blood in a blood stain on the concrete floor. Therefore, under the record before us, the admission of evidence derived from defendant's arrest, *i.e* Christina's identification of defendant in a physical lineup, was harmless error, given the other overwhelming evidence of defendant's guilt.

¶ 101     Consequently, defendant cannot establish that his trial counsel was ineffective. He cannot meet the prejudice requirement under *Strickland*, as he cannot show a reasonable likelihood that his arrest would have been quashed, even if his counsel had challenged the investigative alert. Moreover, because there is no merit to defendant's underlying claim, he cannot establish that he received ineffective assistance at the appellate level.

¶ 102                                             **4. Motive Evidence**

¶ 103     Next, defendant contends that both his trial and appellate counsels were ineffective for failing to object to the introduction of motive evidence where there was no direct evidence presented that defendant previously knew the victim or knew that the victim had money.

¶ 104     Motive is not an element of murder, but evidence tending to show that the defendant had a motive for killing the victim is relevant as such evidence renders it more probable that the

defendant was the individual who killed the victim. Thus, "'[a]lthough the State has no obligation to prove motive, the State may introduce evidence which tends to show that an accused had a motive for killing the deceased.'" *People v. Cook*, 2018 IL App (1st) 142134, ¶ 53, quoting *People v. James*, 348 Ill.App.3d 498, 509 (1st Dist. 2004). "Evidence which tends to establish that the accused had a motive for killing the victim is relevant, \*\*\*if the evidence, at least to a slight degree, tends to establish the motive relied on, [and] is also competent." *People v. Rush*, 294 Ill.App.3d 334, 341 (5th Dist. 1998). "The relevance of motive evidence must be fairly inferable from the evidence; direct testimony to this effect is not necessary." *Cook*, 2018 IL App (1st) 142134, ¶ 57, citing *People v. Wallace*, 114 Ill.App.3d 242, 249 (1st Dist. 1983).

¶ 105     We find the evidence involving the victim's acquisition of a sum of money from the sale of his house was inferable from the evidence in this case, regardless of defendant's direct knowledge of the source of the money. While defendant testified that he did not know about the victim's acquisition of money from the sale of his home, the evidence overwhelmingly established that defendant's motive for killing the victim was based upon his belief that the victim had money inside his apartment. Defendant committed this offense with the assistance of codefendant Reeves, who previously knew the victim. The evidence established that defendant and codefendant Reeves were working together to determine where the victim was keeping his money. Codefendant Reeves first revealed their motive when she jumped into the driver's seat of the victim's car and told Christina that "Don't freak out, I'm going to [the victim's] house, he's got money there, I'm gonna get the money, he's not gonna hurt him, nothing's gonna happen to him." Christina explained that the victim sold his home in Whiting, Indiana for approximately $65,000, that the victim would "sometimes talk about money…he was kind of a showoff."

¶ 106    While defendant was not present inside the victim's vehicle at that time, he called codefendant Reeves as she was inside the victim's apartment looking for money and told her that the victim told him, "[T]here is $2000 under the mattress." When Christina told him that they could not find any money, defendant told her that he had just cut off the victim's ear. Later, defendant said that they were going back to the victim's apartment because "…I didn't do this for nothing, there's something out there [sic] with money." They searched the victim's apartment again for money, did not find any money, and then decided to steal a television and some frozen food.

¶ 107    We also find *People v. Smith*, 141 Ill.2d 40 (1990), to be distinguishable. There, the State's motive theory was that the defendant murdered a prison guard on behalf of the King Cobras' leader due to the guard's intolerance of gang activity, but there was no evidence that the defendant was an active member of the King Cobras or that he was acting on behalf of the gang or its leader. *Smith*, 141 Ill.2d at 58-59. Additionally, the evidence did not suggest that the defendant knew the gang leader harbored animosity toward the guard. *Id*. at 59. "The only evidence even arguably tending to tie the alleged motive to defendant was the testimony that defendant had been seen, on certain occasions, in the presence of [the gang leader]." *Id*. The supreme court found the evidence was "simply too slim a thread upon which to tie the State's theory of motive." *Id*. The problem with the alleged motive evidence in *Smith* was that there was no evidence the defendant was a gang member. Thus, the State improperly portrayed him as a gang member, carrying out the orders of a known gang member, potentially prejudicing the jury.

¶ 108    Here, defendant's motive for killing the victim was the belief that he had money in his apartment and this motive could directly be attributable to defendant. It is plausible that defendant knew about the victim's financial situation based upon defendant's relationship with codefendant Reeves, who had previously sold drugs to the victim. While, in *Smith*, it was not a fair inference

that the defendant was a gang member simply because he had been seen with an alleged gang leader on two occasions, here, it is a fair inference that defendant was motivated to kidnap and kill the victim based upon his belief that the victim had acquired money. Therefore, because the underlying issue is without merit, defendant cannot establish that either his trial or appellate counsels were ineffective for failing to raise this issue.

¶ 109                    **5. Accountability Jury Instruction**

¶ 110    Defendant asserts that he was provided ineffective by his trial counsels and his appellate counsel where they failed to object to the inclusion of an accountability jury instruction or raise this issue on direct appeal. In particular, according to defendant, the indictment, charging him with first degree murder and which did not charge him under a theory of accountability, was "unconstitutionally broadened" by the inclusion of an accountability jury instruction.

¶ 111    Initially, this court recognizes that a point raised but not argued or supported by citation to relevant authority fails to meet the requirements of Supreme Court Rule 341(e)(7), and, therefore, is deemed waived. Ill.Sup.Ct.R. 341(e)(7). Here, defendant failed to support his claim with citation to relevant authority. The case law cited by defendant was not even tangentially related to his claim. Accordingly, we find this issue waived for failure to cite to any relevant authority.

¶ 112    Waiver aside, defendant's claim is without merit. Defendant was charged with eight counts of first degree murder in that he and codefendant Reeves committed the acts supporting a conviction for first degree murder. The jury also received the standard pattern jury instruction defining accountability using Illinois Pattern Jury Instruction, Criminal, No. 5.03 (3d ed. 1992). It is well-established in Illinois that accountability is not a crime in and of itself, and individuals are not charged with the offense of accountability. *People v. Stanciel*, 153 Ill.2d 218, 233 (1992). Rather, "individuals may be charged with a criminal offense, but their guilt is established through behavior

which makes them accountable for the crimes of others." *People v. Testa*, 261 Ill.App.3d 1025, 1030 (2d Dist. 1994). "Accordingly, accountability is a method through which a criminal conviction may be reached." *Testa*, 261 Ill.App.3d at 1030. "In essence, accountability provides an alternative basis of liability, not an additional basis for liability." *People v. Hicks*, 181 Ill.2d 541, 547 (1998). Consequently, because there is no basis for error in defendant's underlying claim, his claims of ineffective assistance of counsel during his trial and on direct appeal must necessarily fail.

¶ 113                                    **6. Batson Challenge**

¶ 114     Defendant contends that his appellate counsel was ineffective for failing to pursue a challenge made during jury selection pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). According to defendant, the trial court erred when it "considered facts totally irrelevant to the *Batson* inquiry[]" when it considered the race of the seated members of the jury as a factor.

¶ 115     In *Batson*, the United States Supreme Court held that, in a criminal case, the fourteenth amendment's equal protection clause prohibits a prosecutor from using a peremptory challenge to exclude a prospective juror solely on the basis of his or her race. *Batson*, 476 U.S. at 89. Under *Batson*, the equal protection clause is violated when the facts show that the State excluded an African American venireperson on the assumption that he or she will be biased in favor of the defendant simply because of their shared race. *Id.* at 97.

¶ 116     The *Batson* Court established a three-step procedure for evaluating claims of discrimination in jury selection. First, "the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race." *People v. Williams*, 209 Ill.2d 227, 244 (2004). During the second step, once the trial court determines defendant has established a *prima facie* case, the burden shifts to the State to provide a race-neutral explanation for excluding the

potential jury members. *Id.* The defendant may then rebut the proffered reason as pretextual. *Id.* Finally, during the third step, the trial court must determine whether the defendant has met his burden of showing purposeful discrimination in light of the parties' submissions. *Id.*

¶ 117    To establish a *prima facie* showing discrimination, a defendant must present relevant factors or circumstances, which raise an inference that the prosecutor challenged the venirepersons on account of their race. See *People v. Williams*, 173 Ill.2d 48, 71 (1996); *People v. Davis*, 231 Ill.2d 349, 360 (2008). Some of the factors generally deemed relevant in establishing a *prima facie* case of discrimination include (1) the racial identity between the defendant and the excluded venirepersons; (2) a pattern of strikes against African American venirepersons; (3) a disproportionate use of peremptory challenges against African American venirepersons; (4) the level of African American representation in the venire as compared to the jury; (5) the State's questions and statements during *voir dire* and while exercising peremptory challenges; (6) whether the excluded African American venirepersons were a heterogenous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witnesses. *Williams*, 173 Ill.2d at 71. These examples, however, are "'merely illustrative'" and are not all inclusive. *People v. Davis*, 345 Ill.App.3d 901, 907 (1st Dist. 2004) (quoting *Batson*, 476 U.S. at 97). Instead, the trial court "must consider 'the totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike." *Davis*, 231 Ill.2d at 360 (quoting *Batson*, 476 U.S. at 94, 96-97). Moreover, the trial court's decision on a *Batson* claim will not be overturned unless it is clearly erroneous. *Id.* at 364.

¶ 118    Initially, we recognize that the trial court conducted a review of defendant's *Batson* claim in which it afforded defendant an opportunity to provide a *prima facie* case of discrimination. After defense counsel presented facts in support of the claim, the trial court reviewed the relevant factors

and concluded that defendant had failed to a *prima facie* case of discrimination. In conclusion, the trial court stated, "I don't believe we've established enough to force the government to explain the race neutral reasons, and I would wish the lawyers would be cautious about making such allegations…"

¶ 119     In support of his claim that the trial court erred in considering the racial makeup of the seated jurors, defendant cites to *United States v. Joe*, 928 F.2d 99 (1991). However, defendant's reliance is misplaced. Specifically, in *Joe*, the court recognized "[a]lthough the presence of members of a defendant's race on a jury may weigh against a finding of discrimination, a defendant is not automatically foreclosed from establishing a prima facie case of discrimination under *Batson* even when members of the defendant's racial group were seated." *Joe*, 928 F.2d at 102, citing *United States v. Grandison*, 885 F.2d 143, 146 (4th Cir. 1989). Recently, our supreme court has also recognized, "the unchallenged presence of jurors of that race on the seated jury is a factor properly considered and tends to weaken the basis for a *prima facie* case of discrimination." [internal citations omitted] *People v Rivera*, 221 Ill.2d 481, 513 (2006); see also *People v. Austin*, 2017 IL App (1st) 142737, ¶ 39 (same); *In re A.S.*, 2016 IL App (1st) 161259, ¶ 29 (same). Consequently, because there is no basis for error in defendant's underlying claim, his claim of ineffective assistance of counsel on direct appeal must necessarily fail.

¶ 120                         **B. Actual Innocence**

¶ 121     For a claim of actual innocence, the supporting evidence must be newly discovered, material and not cumulative, and of such conclusive character that it would probably change the result on retrial. *Jackson*, 2021 IL 124818, ¶ 4, citing *Robinson*, 2020 IL 123849, ¶ 47. "This is a comprehensive approach where the court must determine whether the new evidence places the evidence presented in the underlying proceedings in a different light and 'undercuts the court's

confidence in the factual correctness' of the conviction. *People v. Reed*, 2020 IL 124940, ¶ 49, quoting *People v. Coleman*, 2013 IL 113307, ¶ 97. Because probability and not certainly is the key, the new evidence need not be entirely dispositive to be likely to alter the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47. Within the context of an actual innocence claim, "newly discovered evidence" means evidence that was discovered after trial *and* that petitioner could not have discovered earlier through the exercise of due diligence. *Jackson*, 2021 IL 124818, ¶ 42, citing *Robinson*, 2020 IL 123849, ¶ 47. Evidence is material if it is relevant and probative of the petitioner's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is cumulative if it adds nothing to what was already before the jury. *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 24, citing *People v. Ortiz*, 235 Ill.2d 319, 335 (2009).

¶ 122     Defendant argues that the affidavits of Kiearre Reese constitutes newly discovered evidence of actual innocence. Relying solely upon the fact that the affidavits were discovered "subsequent to his convictions and sentences[,]" defendant contends that he has satisfied the element of the affidavits being newly discovered. The State has presented no argument in its brief for why Reese's affidavit should not qualify as newly discovered evidence – and similarly raises no arguments concerning materiality or cumulativeness – and we can think of none ourselves. See Ill.S.Ct.R. 341(h)(7), (i) (eff. Jan. 1, 2016) (the appellee's brief shall contain reasons supporting its contentions "with citation of the authorities and the page of the record relied on").

¶ 123      We recognize that, while Reese did not aver how she knew defendant at the time of the incident, Reese averred that she did not tell anyone what she saw that day because she was fearful that Shannon Randolph was a gang member, but she was no longer scared because "I know the police can protect me where I'm at now." Defendant could not have discovered this evidence

sooner where defendant was clearly unaware of Reese as a witness where Reese did not tell anyone what she saw that day until she submitted the affidavits in this case.

¶ 124    Reese's affidavits are material and noncumulative where defendant has presented an eyewitness who would testify as to the involvement of other persons in the murder of the victim.

¶ 125    The remaining issue then is whether Reese's affidavits were conclusive enough to necessitate second-stage proceedings. In *Robinson*, our supreme court clarified that the "conclusive character" of newly discovered evidence necessary to support a postconviction petition based on actual innocence does not mean that the new evidence must be entirely dispositive or completely exonerate the defendant. *Robinson*, 2020 IL 123849, ¶ 48. Ultimately, the question is whether the evidence supporting the post-conviction petition "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* at ¶ 48. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 126    We find that Reese's affidavits do not place the evidence in a different light or undermine this court's confidence in the guilty verdict. The new evidence, here, is contradicted by the forensic evidence as well as the trial testimony of Christina Noojin. Reese's attestations that defendant was beaten and repeatedly stabbed in codefendant Reeve's vehicle are contradicted by the forensic evidence showing that no blood was found in that vehicle. Certainly, the type of vicious attack described by Reese would have left an abundance of physical evidence, including the victim's blood, inside that vehicle, but the forensic evidence introduced at trial is in direct contradiction to such a claim. Instead, the physical evidence supported Christina's testimony that the victim was tortured inside defendant's garage. The victim's blood, as established by forensic testing, was

splattered throughout defendant's garage, including a large pool of blood stain on the concrete floor.

¶ 127    Doctor Cogan's testimony also established that the victim was not stabbed to death or attacked with a piece of concrete. Doctor Cogan described in detail the types of injuries that the victim sustained throughout his body, and he never described any of these injuries as being stab wounds. While Reese never testified to seeing any injuries to the back of the victim's head or to the victim's lower jaw, Doctor Cogan found evidence that the back of the victim's head contained an elongated laceration caused by a rounded surface, such as a bat, and the victim's lower jaw was fractured. The victim's underwear was also blood stained and there were contusions to his penis, testicles, and general groin area. Doctor Cogan determined that these injuries were consistent with the use of a man-made object such as "some type of board or some type of squared-off" object. Moreover, Doctor Cogan determined that the victim was physically upright and walking while he was being tortured as indicated by the soles of both feet of the victim were blood stained.

¶ 128    Moreover, Reese's affidavits do not contradict Christina's testimony that she heard defendant tell her that he had just cut off the victim's ear. Doctor Cogan testified that there was a slit on the victim's right ear, along with hemorrhaging, caused by a cut with a relatively sharp object. On the other hand, Reese's affidavit did not attest to seeing anyone cause any injury to the victim's ear.

¶ 129    We also reject defendant's argument that the trial court improperly made credibility determinations in denying defendant's postconviction petition. Judge Linn found that the evidence presented in the affidavits was "very questionable and would have flown in the face a mass [sic] of other evidence against [defendant], and I cannot imagine that anything that's been described to me would change the outcome of these proceedings." This comment was not a credibility

determination so much as it was a finding that the newly discovered evidence would not have affected the outcome of the proceedings.

¶ 130    For the foregoing reasons, we affirm the second-stage dismissal of defendant's postconviction petition.

¶ 131   Affirmed.